IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN RE:<br>CORNELIUS DANDRIDGE, JR.<br><br>Debtor. | Chapter 13<br>Case No. 25-32720-KLP<br>Judge Keith L. Phillips |
| JEFFREY BRUBAKER,<br>DEE ANN BRUBAKER, and<br>JUMP IN, INC.<br><br>Plaintiffs,<br><br>v.<br><br>CORNELIUS DANDRIDGE, JR.,<br>Serve:<br>2744 Dogtown Road<br>Goochland VA, 23063<br><br>Defendant. | APN: ____________ |

**COMPLAINT TO DETERMINE THE DISCHARGEABILITY OF A DEBT PURSUANT TO 11 U.S.C. § 1328 AND TO RECOVER DAMAGES FOR CONVERSION AND EMBEZZLEMENT**

COMES NOW Plaintiffs Jeffrey Brubaker, Dee Ann Brubaker, and Jump In, Inc., a Virginia corporation, by counsel, for their Complaint against Cornelius Dandridge, Jr., portions of which were previously filed in a Complaint filed in the Circuit Court for Hanover County, Virginia, which has been stayed by this Chapter 13 proceeding, and state in support:

**Jurisdiction**

1. This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b)(1).

2. This proceeding constitutes a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I).

3. This proceeding is initiated pursuant to Fed.R.Bankr.P. 7001(a) and (f).

**Parties**

4. Plaintiffs Jeffrey and Dee Ann Brubaker ("the Brubakers") are a married couple and the sole shareholders of Plaintiff Jump In, Inc., a Virginia corporation, which formerly did business as Astro Jump of Richmond.

5. Plaintiff Jump In, Inc. ("Astro Jump") is a Virginia corporation with its principal place of business in Ashland, Virginia, which for over thirty years operated as a party rentals business featuring bounce houses, water slides and other inflatable and mechanical entertainment attractions.

6. Defendant Cornelius Dandridge, Jr. ("Dandridge") is a resident of Goochland County. Upon information and belief, Dandridge was at all times relevant to this Complaint the sole member, manager and CEO of Trelon, LLC, which was a Virginia limited liability company that was newly formed in February 2024 by or on behalf of its sole member Dandridge to purchase the stock and assets of Astro Jump from the Brubakers. Trelon had a registered agent address and principal office address of 2744 Dogtown Road, Goochland, VA 23063, which is the same address as that of Dandridge. Upon information and belief, Trelon is the creature and altar ego of Dandridge, and its affairs are commingled with those of Dandridge.

## Factual Background

### The Sale of Astro Jump Stock and Assets to Trelon and Dandridge

7. Pursuant to the terms of a Stock Purchase Agreement dated April 11, 2024 (the "SPA"), Trelon agreed to purchase the common stock and assets of Astro Jump for a total consideration of $750,000. A copy of the SPA is attached hereto as Exhibit A.[1]

8. Under the SPA, Trelon was to pay $150,000 in cash at the closing on April 11, 2024, a Deferred Down Payment ("DPP") of $300,000 due thirty days after the closing date of April 30, 2024, and the balance of the purchase price via an interest-bearing Promissory Note in the amount of $300,000 payable to the Brubakers over 36 months. *See* Exhibit A at Section 1.03.

9. Although the Brubakers as the selling shareholders were permitted to retain the cash from the Astro Jump bank accounts, they were obliged to credit Trelon as buyer at closing with the amounts then held by Astro Jump for postponed jobs (which could be rescheduled for one year) and customer deposits and similar prepaid amounts for work-in-progress to be completed by Trelon and Dandridge after closing. This cash ($8,664.20 for jobs postponed and $58,238.06 for customer prepaid deposits) was credited to Trelon and Astro Jump at closing as an offset to the $150,000 Trelon and Dandridge were required to pay to the Brubakers at closing. *See* executed Estimated Settlement and Disbursement Statement attached as Exhibit B ("Settlement Statement"). As a result of this and other debits to seller and credits to buyer, the Brubakers received cash at closing of only $34,163, and Trelon and Dandridge only paid $107,463 in cash at

---

[1] The SPA attached here as Exhibit A does not include the voluminous exhibits and schedule to the SPA, which are attached to the SPA as supporting documents to the claims brought by each of the Plaintiffs as claims 22-24 on the Claims Register for this proceeding.

closing. *See* id. Trelon and Dandridge therefore should have had at least $42,537 in customer cash deposits from the SPA's initial $150,000 payment at closing on April 11, 2024 to fund its initial bank accounts.

10. However, Dandridge and Trelon only initially funded the new Astro Jump bank account with an initial $10,000 deposit on April 17, 2024 and another deposit of $10,624.23 on the same date that appears to be from work completed after closing but before the deposit date of April 17, 2024.

**Dandridge and Trelon Loot the Assets of Astro Jump**

11. As stated above and as set forth on Exhibit A, Section 1.03, under the terms of the SPA, Trelon was to make the DDP payment of $300,000 to the Brubakers thirty days after closing, or by May 11, 2024.

12. Trelon failed to make the payment on time, but Dandridge initially placated the Brubakers by insisting he was in talks with lenders and close to securing the funds. Upon information and belief, those representations by Dandridge were false, and Dandridge knew at the time these representations were false.

13. Concerning the DDP, the SPA provides in relevant part:

> **Deferred Down Payment**. Three hundred thousand dollars ($300,000.00), will be via a Deferred Down Payment ("DDP") due 30 days after Closing. Buyer agrees to promptly obtain the financing necessary for the same, which financing shall not use as collateral the assets of the Corporation.
>
> i. If the Seller is not paid the DDP by 30 days after Closing, they have the right, but not the obligation, to declare the transaction void; and
>
> ii. if the transaction is declared void by Seller, Seller may retain the $150,000 cash paid at closing **and Buyer agrees to return all stock and assets of the Corporation to Seller**, and the parties shall have no further obligations to one another, except to respect and return each party's confidential information and documents.

Exhibit A, at Section 1.03(b) (emphasis added).

14. The Brubakers, initially not wanting to re-possess the stock and assets of Astro Jump, gave Trelon and Dandridge some more time to come up with the DDP at Dandridge's request.

15. Instead of paying to the Brubakers the DDP, Dandridge instead systematically looted the assets of Astro Jump as set forth in more detail below.

16. On May 14, 2014, just three days after the DDP of $300,000 was due to the Brubakers but not timely paid, and unbeknownst to the Brubakers, Dandridge caused Astro Jump to write check No. 1003 for $50,000. Despite Dandridge's and Trelon's obligation to return to the Brubakers and Astro Jump all of the books and records of Astro Jump since then, Dandridge has failed provide a copy of said Astro Jump bank check. Upon information and belief, this $50,000 Astro Jump check was made to either Trelon or to Dandridge, or to a third party otherwise for their benefit, at a time when Trelon had defaulted on its $300,0000 DDP payment to the Brubakers and Dandridge was asking for more time to make the payment. The $50,000 check was not used to pay any legitimate business expenses of Astro Jump.

17. Discussions continued between the Brubakers and Dandridge about the DDP, and Dandridge insisted he and Trelon would come up with the money.

18. On May 23, 2024, Dandridge knowingly and intentionally wrote a bad check to Jeff Brubaker in the amount of $50,000 as a "deposit" on the DDP payment of $300,000. *See* NSF Notice attached as Exhibit C. Dandridge has since admitted to Jeffrey Brubaker that he knew the check was a bad check at the time he wrote it. Upon information and belief, Dandridge intentionally wrote the bad check to give himself more

time to loot the Astro Jump bank accounts as set forth herein. After all, Dandridge knew he had written check 1003 for $50,000 as stated above just days before and that those funds were therefore no longer in the Astro Jump bank account. Jeffrey Brubaker relied to his detriment on Dandridge's intentional misrepresentation that the check was good to allow Dandridge more time to come up with the required DDP. However, Dandridge used this additional time instead to continue his systematic looting of Astro Jumps' assets.

19. On June 4, 2024, with the DDP still unpaid, the Brubakers personally delivered written notice to Trelon and Dandridge that they were invoking Section 1.03(b) of the SPA to declare the transaction void and demanding the return of the stock and all company assets, specifically including all bank funds for customer prepaid deposits and the like. *See* Notice Letter attached as Exhibit D.

20. It was not until June 10, 2024 that Dandridge and Trelon turned over operational control of the business assets and some business records, and they still did not at that time turn over any Astro Jump bank records. Instead, Trelon and Dandridge proceeded to continue looting the financial and other assets of Astro Jump. It was not until June 17, 2024 that Dandridge and Trelon turned over some of the bank account records for Astro Jump. Trelon and Dandridge never turned any of the Astro Jump bank funds, including the substantial customer deposit prepayments for future rentals to be performed after the Brubakers took over the ownership and operation of Astro Jump.

21. Plaintiffs have subsequently learned from Astro Jump's reservation software that for the time period from closing on April 11, 2024 until the June 4th notice, Dandridge and Trelon collected customer deposits in the amount of $47,424 for future

rentals to be performed from June 5, 2024 through December 31, 2024. The reservation software also showed that of the $42,537 in customer cash deposits credited to Trelon at closing, $37,170.47 should have remained in the Astro Jump bank accounts for events that had not occurred but still needed to be serviced from June 5, 2024 through December 31, 2024. No Astro Jump customer deposit funds – or any other Astro Jump bank funds – were ever returned by Trelon or Dandridge as required, and Plaintiffs have been damaged in the amount of at least **$84,594.47** by Dandridge's and Trelon's refusal to return these customer deposits.

22. In addition to the missing customer deposits, Trelon and Dandridge completed booked rentals worth approximately **$238,624.92** for rentals during the time period from the day after closing on April 12, 2024 until June 4, 2024. Of this amount, at least **$168,127.40** should have been deposited into the Astro Jump bank account. Trelon and Dandridge have failed and refused to account for these funds. While a portion of those revenues were used to pay legitimate business expenses, it is clear from Plaintiffs' initial investigation that many legitimate business expenses went unpaid, as is set forth in more detail below, while Dandridge instead personally embezzled significant Astro Jump assets that should have been returned to Plaintiffs.

23. By way of example only, without limitation, Dandridge caused Trelon to transfer at least **$51,700** from Astro Jump's bank account to that of Trelon (controlled by Dandridge) in the short period of time that Trelon and Dandridge owned and operated Astro Jump. These "distributions" to Dandridge as the new equity holder of Astro Jump were plainly improper because Trelon and Dandridge (and by extension Astro Jump) were then unable to meet the obligation to pay the DDP to the Brubakers.

24. The $51,700 Dandridge and Trelon paid themselves in the preceding paragraph does not include the $50,000 check described above that was written for Dandridge's and Trelon's benefit on May 14, 2024, after Trelon had already defaulted on its obligation to make the $300,000 DDP payment. It also does not include a $5,000 online transfer to Dandridge made on May 6, 2024, when Trelon was days away from defaulting on the $300,000 DDP payment. It also does not include $8,905.70 in payments from the Astro Jump bank account to the Saade Law Firm made *after* Plaintiff's June 4th notice to return all Astro Jump assets to Plaintiffs for Dandridge's and Trelon's representation in the negotiation and drafting of the SPA, which closed on April 11, 2024. Under the SPA, those funds were to have been paid by Trelon or Dandridge, not by Astro Jump at a time when those funds were required to be returned to Plaintiffs.

25. Thus, a total of at least $115,605.70 plus the customer deposits in the amount of $84,594.47 set forth above in Astro Jump bank funds should have been returned by Trelon and Dandridge upon the Plaintiff's June 4, 2024 notice. There was therefore a total of at least **$200,200.17** in the foregoing funds that should have been in the Astro Jump bank account and returned to Plaintiffs after their June 4th notice to Trelon and Dandridge. Again, however, no Astro Jump bank funds were ever returned to Plaintiffs, not even the $1,419.90 that remained in the account after Dandridge's systematic looting of the same.

26. However, the misconduct engaged in by Trelon and Dandridge does not end there. Dandridge also used Astro Jump funds to purchase a laptop computer for the business that was not returned to Plaintiffs and instead converted by Dandridge. On May 24, 2024, after Trelon was in default for the missed $300,000 DDP payment, Dandridge

also used Astro Jump funds to purchase a set of tires for his personal pickup truck, which tires or the funds therefore were also not returned to Plaintiffs. Dandridge also purchased an industrial floor fan for the warehouse from Harbor Freight with Astro Jump funds which he took and did not return to Plaintiffs. Dandridge also retained a zip drive that was purchased by Astro Jump after closing that contains confidential business records, which zip drive and records were required to be returned to Plaintiffs. There were numerous other purchases made at Best Buy and other retailers with Astro Jump funds and other bank withdrawals made that are unexplained and for which no corresponding assets or receipts were returned to Plaintiffs. Plaintiffs estimate that approximately **$12,000** in goods and funds was looted from Astro Jump in this manner and not returned to Plaintiffs by Dandridge or Trelon.

27. In addition, Dandridge and Trelon have not accounted for certain payments that were received by Astro Jump during the short period of time in which Dandridge and Trelon controlled the business. For example only, without limitation, a used bounce house was sold for $800 to a customer, and the funds were not deposited into the Astro Jump bank account. There were payments for rentals collected by Dandridge *after* the June 4th notice of at least $2,815.95 that were not turned over to Astro Jump or the Brubakers. Therefore the total revenues that should have been in the Astro Jump bank account upon the return of the business is at least **$3,615.95**. Upon information and belief, there were other such payments made for Astro Jump rentals that were personally pocketed by Dandridge and should be accounted for by Dandridge.

28. Despite embezzling the substantial customer prepayment deposits and other Astro Jump funds as set forth herein, Dandridge and Trelon also failed to pay

legitimate Astro Jump business expenses during their brief tenure that have now been paid or are now owed by Plaintiffs. These include without limitation license fees to the Astro Jump licensor for the months of April and May, and the first four days of June. This was despite the fact that the Brubakers paid Trelon and Dandridge at closing for their pre-closing share of the April fees due. These Astro Jump licensing fees owed by Trelon and Dandridge that were unpaid total $24,211.25. Trelon and Dandridge also failed to pay Virginia state sales taxes for the entire month of April (despite again being credited at closing by Plaintiffs for those taxes attributable to April 1 to April 11 2024), the entire month of May, and the first four days of June. These unpaid Virginia sales taxes with penalties and interest that have since been paid by Plaintiffs total $4,302.39. Trelon and Dandridge also failed to pay the eVA payment of $71.64 for a Virginia State University rental, despite receiving those funds from the Brubakers, and they also failed to pay a Dominion Power bill for the warehouse in the amount of $219.23 for the time period from April 26, 2024 to May 24, 2024. Finally, Trelon and Dandridge opened a credit account with Sheetz and failed to pay at least $4,901.40 in charges they incurred, which amount has been paid by Plaintiffs. The total amount of unpaid liabilities that Trelon and Dandridge should have paid in the ordinary course but instead left for Plaintiffs to pay totals at least **$33,705.91**.

29. The total amount of stolen Astro Jump customer deposit prepayments, diverted revenues, converted funds or goods and unpaid liabilities thus totals at least **$249,522.03**, and Plaintiffs have suffered damages in this amount from the wrongful misconduct of Dandridge herein.

**Count I: Tortious Interference with Contract**

30. The allegations of the foregoing paragraphs are re-alleged and incorporated here.

31. The SPA was a valid written contract between the Brubakers and Trelon, pursuant to which Trelon was required to make the $300,000 DDP payment by May 11, 2024. Trelon, at the behest and direction of Dandridge, breached its obligation to make the payment as aforesaid.

32. Upon Trelon's failure to remedy its breach of contract in making the DPP payment by May 11, 2024 as set forth above, the Brubakers delivered their notice to declare the transaction void and Trelon was obligated to return all stock and assets of Astro Jump to the Brubakers.

33. Dandridge tortiously interfered in the contract between Trelon and Plaintiffs by failing to make the DPP payment and thereafter embezzling the assets of Astro Jump for his personal benefit instead of returning and causing Trelon to return all of the assets to Plaintiffs as required by the SPA.

34. Dandridge used tortious, dishonest and illegal means to interfere in the contract by, among other things, knowingly and intentionally writing a bad check to Jeffrey Brubaker for $50,000.00 for a portion of the DPP, in an attempt to forestall Plaintiffs from immediately declaring the transaction void under the SPA and to enable Dandridge more time within which to loot the assets of Astro Jump for his personal benefit.

35. As a direct result of Dandridge's tortious interference with contract, Plaintiffs have been damaged in the amount of at least **$249,522.03.**

**Count II: Conversion**

36. The allegations of the foregoing paragraphs are re-alleged and incorporated here.

37. Upon the notice to Dandridge and Trelon on June 4, 2024 that Plaintiffs were declaring the transaction void, Plaintiffs had an immediate right to possession of the assets of Astro Jump.

38. Dandridge and his controlled entity Trelon, with the intent to wrongfully deprive Plaintiffs of their property and to appropriate Astro Jump's property to himself, has without authorization assumed and exercised the right of dominion and control over money and other assets that rightfully belong to Plaintiffs, and Dandridge has wrongfully converted Plaintiffs' assets to their own use.

39. As a result of the conversion of the Astro Jump assets by Dandridge, Plaintiffs have suffered damages in the amount of at least **$249,522.03.**

**Count III: Accounting**

40. The allegations of the foregoing paragraphs are re-alleged and incorporated here.

41. Upon the notice to Dandridge and Trelon herein on June 4, 2024 that Plaintiffs were declaring the transaction void, Plaintiff herein had an immediate right to possession of all of the assets of Astro Jump.

42. Dandridge and his entity Trelon wrongfully withheld and converted the assets of Astro Jump thereafter and have failed and refused to return the same to Plaintiffs, or to account therefore.

43. It would be inequitable for Dandridge not to account for his misappropriation and conversion of the assets of Astro Jump, including without limitation the customer prepaid deposits held by Astro Jump for future events, and to restore the same in full to Plaintiffs.

44. The Court should therefore order that Dandridge provide a full and complete accounting of his use and misuse of the assets of Astro Jump from the closing of the transaction on April 11, 2024 to the present, and order that all assets of Astro Jump be returned to Plaintiffs.

**Count IV: Denial of Discharge Pursuant to 11 U.S.C. § 1328(a)**

45. The allegations of the foregoing paragraphs are re-alleged and incorporated here.

46. 11 U.S.C. § 1328(a)(2) incorporates in a Chapter 13 proceeding certain of the exceptions to discharge set forth in 11 U.S.C. § 523(a), including in relevant part 11 U.S.C. § 523(a)(2)(B), use of a false statement in writing on which a creditor reasonably relied to obtain money or property, and 11 U.S.C. 523(a)(4), for embezzlement.

47. The Debtor's Schedule E/F lists an unsecured, nonpriority debt of $249,522.03 to Creditor No. 4.9, Jump In, Inc., for a "Judgment" [sic] in favor of Creditor (the "Debt"), which the Debtor Dandridge seeks to discharge through his Chapter 13 filing.

48. The Debtor has incurred the Debt, which discovery may prove to be of a greater amount, as a proximate result of the dishonest and criminal activity described herein.

49. As described herein, 1) the Debtor, Dandridge, made or caused to have made misrepresentations to Plaintiffs, including written misrepresentations in the form of an intentional bad check for $50,000; 2) that the Debtor knew were false; 3) with the intent and purpose to deceive Plaintiffs; 4) Plaintiffs reasonably relied on the misrepresentations; and 5) Plaintiffs sustained loss and damage as the proximate result of the misrepresentations.

50. As a result, the Debtor is not entitled to a discharge of the Debt under 11 U.S.C. § 523(a)(2)(B).

51. Also as described herein, the Debt has been incurred by the Debtor because the Debtor has converted to his dominion and control, and to the dominion and control of an entity controlled by him, money rightfully belonging to Plaintiffs, proximately causing damage to Plaintiffs.

52. As result, the Debtor is not entitled to a discharge of the Debt under 11 U.S.C. § 523(a)(4).

WHEREFORE, Plaintiffs pray 1) that this Court enter judgment in their favor against the Debtor in the amount of at least $249,522.03, 2) that they recover their costs and interest as provided by the law, and reasonable attorney's fees expended herein as provided by the SPA, and 3) that the Court hold that these amounts constitute debts that are not dischargeable by the Debtor under 11 U.S.C. § 1328(a).

October 6, 2025

Respectfully submitted,

JEFFREY BRUBAKER, DEE ANN
BRUBAKER and JUMP IN, INC.

/s/ Scott A. Simmons
Counsel

Scott A. Simmons (Va. State Bar No. 37744)
Scott Simmons Law PC
116 B. Walton Park Lane
Midlothian VA 23114
(804) 486-6128
(804) 486-6500 (Fax)
simmons@scottsimmonslaw.com
Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of October, 2025, a true and correct copy of the foregoing Complaint was served by electronic means through the Court's CM/ECF System to all persons receiving electronic notice and/or by first class mail, postage prepaid, to the following:

Suad Bektic
New Day Legal
8500 Mayland Drive
First Floor
Richmond, VA 23294
(804) 417-4905
Counsel for Debtor

Carl M. Bates
P.O. Box 1819
Richmond, VA 23218
Trustee

/s/ Scott A. Simmons
Scott A. Simmons
(Va. State Bar No. 37744)
Scott Simmons Law PC
116 B Walton Park Lane
Midlothian VA 23114
(804) 486-6128
(804) 486-6500 (Fax)