# Exhibit A

# STOCK PURCHASE AGREEMENT

**THIS STOCK PURCHASE AGREEMENT** (this "Agreement") is made and entered into this 11th day of April, 2024 ("Effective Date"), by and among **JEFFREY BRUBAKER and DEE ANN BRUBAKER, individuals (each, a "Seller" and, collectively, the "Sellers")** and **TRELON, LLC**, a Virginia limited liability company, (hereinafter the "**Buyer**").

## RECITALS:

Whereas, JUMP IN, INC., is a Virginia corporation with a principal address at 1420 Westshire Lane, Richmond, Virginia 23238 (the "Corporation");

Whereas, Sellers, collectively, are the sole shareholders the Corporation and own one hundred shares of common stock of the Corporation, as set forth in Schedule 1, attached hereto and made a part hereof, which represents one hundred percent (100%) of the authorized and issued stock of the Corporation (the "Shares");

Whereas, Seller desires by this Agreement to sell, transfer, and assign the Shares to Buyer, and Buyer desires by this Agreement to purchase, accept, and assume the same, each according to the terms set forth herein.

Now, Therefore, for and in consideration of the mutual covenants hereinafter set forth, and other good and valuable consideration, the receipt, adequacy, and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

## Article I.
## SALE AND PURCHASE OF SHARES

**1.01. Shares.** On the **Closing Date** (as hereinafter defined), Seller shall sell to Buyer and Buyer shall acquire from Seller, an aggregate of One Hundred Percent (100%) of the Shares of the Corporation, including but not limited to, the Shares owned by Seller ("Ownership Interest" or "Interest") free and clear of all liens, encumbrances, security interests, charges, mortgages, indentures, pledges, options, rights of other Persons (as defined below), voting trusts, restrictions and claims of any kind (collectively, "Liens"), and on the basis of the representations, warranties, covenants and agreements contained herein.

**1.02. Purchase and Transfer of Assets.**

**a.** All of the Corporation's assets including, without limitation, all FF&E, all tangible and intangible assets, except for those excluded below in Section 1.02(b) (including access to email lists, online properties, licenses, and trademarks, belonging to Vannox Diversified Entertainment (AstroJump corporate)), all current inventory, and all shares of JUMP IN, INC., will transfer to Buyer on the Closing Date ("Corporation Assets"). The Corporation will provide Buyer with a list of all Corporation Assets owned by Corporation as of the Effective Date contemporaneously with the execution of this Agreement and the **Bill of Sale** attached hereto and made a part hereof as **Schedule 13**.

b. Excluded assets are the Seller's Personal computer and laptop (all necessary business files will be transferred); cash on hand and in the Corporation's bank accounts.

**1.03. Sale of Assets.** Buyer agrees to pay Seller **Seven Hundred and Fifty Thousand Dollars and Zero Cents ($750,000.00) ("Purchase Price").** The Purchase Price shall be paid to Seller as follows:

a. **Cash at Closing**. On the Closing Date, Buyer shall pay to Seller **One Hundred and Fifty Thousand Dollars and Zero Cents** ($150,000.00).



DS JAB DS DAB DS CD

b. **Deferred Down Payment**. Three hundred thousand dollars ($300,000.00), will be via a Deferred Down Payment ("DDP") due 30 days after Closing. Buyer agrees to promptly obtain the financing necessary for the same, which financing shall not use as collateral the assets of the Corporation.

i. If the Seller is not paid the DDP by 30 days after Closing, they have the right, but not the obligation, to declare the transaction void; and

ii. if the transaction is declared void by Seller, Seller may retain the $150,000 cash paid at closing and Buyer agrees to return all stock and assets of the Corporation to Seller, and the parties shall have no further obligations to one another, except to respect and return each party's confidential information and documents.

c. **Seller's Financing**: Buyer shall pay the balance of the Purchase Price to Seller in the form of a Seller note ("**Note**") secured by the Corporation Assets in the form set forth in **Exhibit A**, attached hereto, in the principal amount of **Three Hundred Thousand Dollars and Zero Cents ($300,00.00),** payable over Thirty-Six (36) months with the first monthly instalment commencing approximately **60 days after payment of DDP**, with interest at **Five percent (5%) APR**, compounded annually ("**Seller's Financing**"). The Seller's Financing has the following additional terms either stated in the Note or as otherwise indicated:

i. Payments shall be due on or before the fifteenth (15th) day of each month;
ii. No penalties for early payment of outstanding principal and interest; and
iii. Buyer's payment obligation will be secured solely by a first lien position in favor of Seller of the Corporation's business assets.

**1.04. Closing.** The transfer and exchange provided for in this Agreement (the "**Closing**") shall take place on April 11, 2024, (or on such later date as may be mutually agreed by the parties), at 12:00 o'clock p.m. at the office of Seller's counsel or via electronic signing, or on such other date or at such other place as the parties may mutually agree (such date is herein referred to as the "**Closing Date**").

**1.05. Deliveries by Seller Pre-Closing.** [INTENTIONALLY OMITTED]

**1.06. Deliveries by Seller at Closing**. The Closing shall be deemed to be effective for purposes of this Agreement as of the opening of business on the Closing Date. At Closing, Seller shall deliver (or cause to be delivered as applicable) to Buyer the following document or instruments, in form and substance reasonably satisfactory to Buyer:

a. a corporate certificate from the Corporation, substantially in the form attached hereto and made a part hereof as **Schedule 2**, dated as of the date of delivery to Buyer and duly executed on behalf of the Corporation, certifying as to the matters specified therein;

b. an affidavit from each Seller, substantially in the form attached hereto and made a part hereof as **Schedule 3**, dated as of the date of delivery to Buyer and duly executed by such Seller, stating that: (i) title to its respective percentage of the Shares was taken in the name of such Seller; (ii) such Seller has full power and authority to convey its respective percentage of the Shares; (iii) nothing prohibits or restricts such Seller from conveying its respective percentage of the Shares; and (iv) the affidavit is made to induce Buyer to purchase the Shares and that Seller agrees to indemnify Buyer and hold Buyer harmless from any loss or damage resulting from its reliance of the matters set forth in the affidavit or this Agreement;

c. an affidavit from Seller, substantially in the form attached hereto as **Schedule 3** dated as of the date of delivery to Buyer and duly executed by such Seller, stating that: (i) title to its respective percentage of the Shares was taken in the name of such Seller; (ii) such Seller has full power and authority to convey its respective percentage of the Shares; (iii) nothing prohibits or restricts such Seller from conveying its respective percentage of the Shares; and (iv) the affidavit is made to induce Buyer to purchase the Shares and that Seller agrees to indemnify Buyer and hold Buyer harmless from any loss or damage resulting from its reliance of the matters set forth in the affidavit or this Agreement;

d. a counterpart of an assignment of Shares from Seller as to One Hundred percent (100%) of the Shares owned by Seller, substantially in the form attached hereto as **Schedule 4** dated as of the date of delivery to Buyer and duly executed by Seller and in respect of the conveyance and transfer of the Shares to the Buyer (collectively, the "Assignment of Shares");

e. all of the issued and outstanding shareholder certificates, if any, representing the Shares endorsed by each Seller in favor of Buyer;

f. as required by Buyer in its sole and absolute discretion, the resignations of the registered agent and all officers and directors of the Corporation, duly executed and in a form reasonably acceptable to Buyer;

g. all original books and records of the Corporation, including, but not limited to documents relating to the Corporation's organization, existence, qualification to do business, ownership, management, operation, meeting minutes, bookkeeping, accounting, banking, employee records, permits, licenses, transactions, contracts and obligations (collectively, the "Corporation Records");

h. counterparts to any governance documents of the Corporation requested by Buyer, in its sole and absolute discretion, including, but not limited to, a Articles of Incorporation, an Amended and Restated Bylaws, shareholder and/or manager resolutions and consents; and

i. such further documents as may be reasonably requested by Buyer in order for (i) Seller to convey and transfer to Buyer, and Buyer to acquire and accept from Seller, the Shares, free and clear of all Liens, and (ii) Buyer to become a shareholder of the Corporation.

**1.07. Deliveries by Buyer Pre-Closing.** [INTENTIONALLY OMITTED]

**1.08. Deliveries by Buyer at Closing**. At the Closing, Buyer shall deliver to Seller the following documents or instruments, in form and substance reasonably satisfactory to Seller:

(a) a counterpart of the Assignment of Shares, dated as of the Closing Date and duly executed by Buyer;

(b) a counterpart of the settlement statement for the Closing; and

(c) such further documents as may be reasonably requested by Seller in order for Seller to convey and transfer to Buyer, and Buyer to acquire and accept from Seller, the Shares, free and clear of all Liens.

(d) Executed Promissory Note, security agreement ("Security Agreement"), attached hereto as Schedule 12, Loan Agreement, and such additional documents that are necessary or required to secure and collateralize the assets of the Corporation.



DS JAB DS DAB DS CD

## Article II.
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby makes the following representations and warranties to Buyer, each of which shall be unaffected by any investigation heretofore or hereafter made by Buyer. The representations and warranties of Seller shall survive closing for a period of twelve (12) months.

**2.01. Seller.** Each Seller, with respect to itself, hereby represents and warrants to Buyer, as of the date hereof and as of the Closing Date, as follows:

(a) *Authority and Capacity.* Seller has all requisite power, authority and legal capacity to enter into this Agreement, to perform its agreements and obligations under this Agreement in accordance with its terms and to consummate the transaction contemplated hereby. If any Seller is a corporation or limited liability company, such Seller is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization. Seller has obtained all necessary authorizations and approvals from such Seller and (if applicable) its shareholders, members, manager(s), and/or directors necessary for the execution and delivery of this Agreement and all Seller Documents (defined below) and the consummation of the transactions hereby. The execution, delivery and performance of this Agreement by Seller, including any other agreements, statements, certificates, instruments or other documents to be executed and delivered by Seller in connection with this Agreement (collectively, the "Seller Documents"), does not and the consummation of the transaction contemplated hereby will not: (i) result in breach of, constitute a default under, or be in conflict with any contract, instrument, commitment or arrangement to which Seller or the Corporation is a party or by which Seller is bound or to which any of Corporation's assets are subject, including, but not limited to, the Articles of Incorporation or other constitutive or governance documents of the Corporation; (ii) violate, constitute a default under or be in conflict with any law, judgment, order, injunction, decree or award of any arbitrator or Governmental Authority to which Seller, the Corporation, or any of Seller's assets or the Corporation's Assets are subject; or (iii) require the consent, approval, waiver, clearance, permit, license or authorization of, by or from, any filing with, or any notice to, any Person, other than those disclosed on **Schedule 5**, attached hereto and made a part hereof (the "**Necessary Approvals**").

(b) Seller is the owner, beneficially and of record, of the Ownership Interests of the Corporation as set forth in Section 1.01 of this Agreement. Seller has complete and unrestricted power, authority, and legal capacity to enter into this Agreement and to perform its obligations hereunder. This Agreement has been duly authorized, executed and delivered by Seller and constitutes legal, valid, and binding obligations of Seller enforceable against Seller in accordance with its terms. The execution, delivery and performance of this Agreement by Seller, including any other agreements, statements, certificates, instruments or other documents to be executed and delivered by Seller in connection with this Agreement (collectively, the "Seller's Documents"), do not and the consummation of the transaction contemplated hereby will not: (i) result in breach of, constitute a default under, or be in conflict with any contract, instrument, commitment or arrangement to which Seller or the Corporation is a party or by which Seller is bound or to which any of Corporation's assets are subject, including, but not limited to, the Corporation's Articles of Incorporation, Articles of Incorporation, an Amended and Restated Bylaws, or other constitutive or governance documents of Seller or the Corporation; (ii) violate, constitute a default under or be in conflict with any law, judgment, order, injunction, decree or award of any arbitrator or Governmental Authority to which Seller, the Corporation, or any of Seller's assets or the Corporation's Assets are subject; or (iii) require the consent, approval, waiver, clearance, permit, license or authorization of, by or from, any filing with, or any notice to, any Person.

(c) Seller, as further inducement to Buyer to enter into this Agreement, offers the following additional representations and commitments to Buyer:



DS JAB DS DAB DS CD

i. Both individual Sellers will provide a minimum of thirty (30) days transition training at no extra cost to Buyer, to begin immediately after the Closing Date ("Training Period"). Sellers will be available for fourteen (14) additional days to consult with Buyer at no charge after the Training Period if requested by Buyer.

ii. After the Closing, all of the Corporation's financial and operational decisions will be made by TRELON, LLC.

**2.02. Binding Agreement**. This Agreement has been duly and validly executed and delivered by Seller and constitutes Seller's legal, valid and binding agreement, enforceable against Seller in accordance with its terms. At or prior to Closing, each of the other Seller Documents shall be duly executed and delivered by Seller and shall constitute the legal, valid and binding obligation of Seller enforceable against it in accordance with its terms.

**2.03. The Shareholders**. (i) Seller is the sole and lawful record holder and beneficial owner of one hundred percent (100%) of the Shares of the Corporation, including, but not limited to, all of the Shares, free and clear of all Liens; (ii) Seller has good and marketable title to its respective percentage of the Shares; (iii) Seller has full power and authority to convey his respective percentage of the Shares; and (iv) nothing prohibits or restricts Seller from conveying its respective percentage of the Shares.

**2.04. The Corporation.** The Corporation is a registered corporation duly organized, validly existing and in good standing under the laws of Virginia. The Corporation has the requisite corporate power and authority to carry on the business in which it is engaged and to own its assets. The execution, delivery and performance of this Agreement by Seller does not and the consummation of the transaction contemplated hereby will not (i) conflict with any provision of the Corporation's Articles of Incorporation, Restated Articles of Incorporation, or other constitutive or governance documents; (ii) result in breach of, or constitute a default under, any contract, instrument, commitment or arrangement to which the Corporation is a party, by which the Corporation is bound or to which any of the Corporation's assets are subject; (iii) violate any law applicable to the Corporation or any judgment, order, injunction, decree or award of any arbitrator or Governmental Authority applicable to or binding upon the Corporation; (iv) not result in the imposition of a Lien on any of the Corporation's assets. There are no restrictions on the sale, transfer, or pledge of the Corporation's Shares in any contracts to which the Corporation is a party. No approval or consent of any persons other than Seller is necessary in order to consummate the transaction contemplated hereby. The Corporation has good and marketable title to all the Corporation's assets listed on **Schedule 6** (the "Corporation Assets"), free and clear of all mortgages, liens (statutory or otherwise), security interests, claims, pledges, licenses, equities, options, conditional sales contracts, assessments, levies, easements, covenants, reservations, restrictions, exceptions, limitations, charges, or encumbrances of any nature whatsoever. The Corporation has all licenses, registrations and permits necessary to permit the Corporation to carry on the business of the Corporation as presently conducted immediately prior to the Closing.

**2.05. Corporation Records**. Such Corporation Records as exist are correct in all material respects.s

**2.06. Financial Statements.** The Financial Statements (as defined below) are true and correct in all material respects and have been prepared according to a consistent system of accounting in good faith and complies with all applicable laws and does not conflict with basic accounting industry practices and there are no liabilities of the Corporation that are not disclosed therein. Since the date of the most recent of these Financial Statements, Seller warrants and represents that none of the following has occurred: (i) the authorization or issuance of members distributions, any membership interest in the Corporation or any direct or indirect redemption, purchase or other acquisition by the Corporation of any such membership interest; (ii) any change in the assets, liabilities, obligations, income or business of the Corporation (including, but not limited to) cancelation of any debts or waiver of any rights other than those disclosed on **Schedule 8**. There has not been any change in the rate of compensation paid any officer, director, employee, agent or consultant of the Corporation from that paid on the date of the most recent Financial Statements, except for changes in the ordinary course of business consistent with past practices.



DS JAB DS DAB DS CD

**2.07. Absence of Certain Events.** Since the date of the financial statements previously delivered to Buyer, if any, the business of the Corporation has been operated only in the ordinary and normal course of business and to the knowledge of Seller there has not been any material adverse change in the financial condition, assets, liabilities, results of operations, or prospects of the Corporation and, to the knowledge of Seller, there has been no occurrence, circumstances or combination thereof which might be expected to result in any such material adverse change before or after the Closing Date.

**2.08. Title to Properties.** The Corporation has good and marketable title to all of its real, personal and mixed properties (the "Corporation Assets"), free and clear of all mortgages, liens, pledges, charges, claims, leases, restrictions or encumbrances of any nature whatsoever, and subject to no restrictions with respect to transferability. All of the Assets are in the Corporation's possession and control.

**2.09. Contracts. Schedule 10** attached hereto is a list and/or documents themselves of all contracts, leases, licenses, commitments, and other agreements relating to the Corporate Assets and the operation of the business of the Corporation. Each of such contracts, leases, licenses, commitments, and agreements is in full force and effect and constitutes the legal, valid, and binding obligations of the Corporation. The Corporation is not in default and has not received or given any notice of default under any such contract, lease, license, commitment, or other agreement or under any other obligation relating to the Assets or the business of the Corporation.

**2.10. Absence of Undisclosed Liabilities.** Except as and to the extent specifically disclosed in this Agreement and reflected on **Schedule 11**, attached hereto (the "Existing Liabilities and/or Agreements"), Seller represents and warrants that Corporation does not have any Liabilities which will have a material adverse effect on the business, financial condition, or results of operations of Corporation. Except as and to the extent described in this Agreement, Seller has no knowledge of any basis for the assertion against Seller of any Liability and to the knowledge of Seller, which may give rise to Liabilities. To the extent that any Liabilities arise prior to Closing, such Liabilities shall remain the sole responsibility of Seller and shall not be assigned in any way to Buyer.

**2.11. Absence of Undisclosed Claims**. To the best of Seller's knowledge, there are no actions, suits, proceedings, claims, demands, arbitrations or legal or administrative proceedings or investigations of any kind, pending or threatened (collectively, "Claims"), against or affecting Seller or the Corporation that restrain or prohibit (or seek to restrain or prohibit) the consummation by Seller of the transaction contemplated hereby or that might result, either individually or in the aggregate, in any material adverse changes in the business, assets or condition of the Corporation taken as a whole, financially or otherwise.

**2.12. Indemnification.** Seller warrants and agrees to indemnify Buyer and hold Buyer harmless from any loss or damage resulting from its reliance of the representations and warranties set forth in this Agreement. Furthermore, Buyer is absolved of all existing, past, and future liabilities pertaining to liabilities and/or causes of action that accrued prior to the date of Closing, except for those disclosed on the Prorations and Work-in-Progress worksheet disclosed on **Schedule 10**, which Buyer agrees to assume and complete after Closing. Seller hereby agrees to indemnify and hold harmless Buyer in all liabilities, debts, and judgments, and the defense thereof, pertaining to such lawsuit and any other lawsuits that may arise out of the actions of Seller prior to Closing, subject to any insurance coverage which the Corporation has to cover any such claim or liability.

**2.13. No Litigation or Adverse Events.** Seller represents and warrants that there are no outstanding orders, judgments, injunctions, awards or decrees of any court, arbitrator or governmental or regulatory body involving the Corporation. To the knowledge of Seller, no suit, action or other proceeding or reasonable basis therefor, or no investigation by any governmental agency, pertaining to the Corporation or its Assets is pending or has been threatened against the Corporation or Seller which could adversely affect the financial condition or prospects of the Corporation or the conduct of the business thereof.

**2.14. No Violation.** The execution and delivery of this Agreement and all other agreements, instruments and documents contemplated hereby and the consummation of the transactions contemplated hereby will not conflict with or violate or constitute a breach or default under the Articles of Incorporation of the Corporation, or



DS JAB DS DAB DS CD

any provision of any mortgage, trust indenture, lien, lease, agreement, instrument, order, judgment, decree or other restriction of any kind or character to which the Corporation or Seller are subject or result in the creation or imposition of any lien, claim, charge or encumbrance of any nature whatsoever upon the Corporation Assets or the Ownership Interests.

**2.15. Taxes. To the knowledge of Seller,** the Corporation: (i) has filed all required federal, state and local tax returns and has fully paid all federal, state and local taxes due; (ii) has fully complied with all provisions of all federal, state and local tax laws; and (iii) has not had any tax deficiencies or adjustments proposed or assessed against it and has not executed a waiver of the statute of limitations on the assessment or collection of any tax. No taxing authority has audited the books, records, or returns of the Corporation. To the knowledge of Seller, all taxes that have become due and payable by the Corporation have been timely paid, and the Corporation is not and shall not be liable for any taxes or additional taxes in respect to any taxable period arising before the Closing Date. To the knowledge of Seller, the Corporation has timely withheld and paid all taxes that are required to have been withheld and paid by it in connection with amounts paid or owing to any employee, creditor, independent contractor or other person.

**2.16. Compliance with Laws**. Since its formation, the Corporation has been and is currently in compliance in all material respects with all applicable laws and regulations, including, without limitation, all laws and regulations relating to its business. The Corporation has not received notice that it is in violation of any applicable federal, state, or local statute, law, ordinance, or regulation affecting or that might result, either individually or in the aggregate, in any material adverse changes in the business, assets or condition of the Corporation taken as a whole, financially, or otherwise.

**2.17. Disclosure.** No representation or warranty furnished by Seller to Buyer in this Agreement contains or shall contain any untrue statement of a material fact or omits or shall omit any material fact required to make such statements not misleading. Through the Closing Date, Seller shall have a continuing obligation to promptly notify Buyer in writing with respect to any matter hereafter arising or discovered which, if existing or known at the date of this Agreement, would have been required to be set forth or described herein, but no such disclosure shall cure any material breach of any representation or warranty made by Seller hereunder.

**2.18. Disclosures to Key Employees.** The Buyer requests the disclosure of the sale of the business to the key employee(s) of Buyers choice, in agreement with the Seller, to discuss strategic management of Corporation operations post acquisition. Additionally, The Corporation has no employees, except for those identified in **Schedule 9**.

## Article III.
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants that Buyer has the complete and unrestricted power to enter into this Agreement and to perform its obligations hereunder and that this Agreement constitutes a legal, valid, and binding obligation of Buyer enforceable against Buyer in accordance with its terms. The representations and warranties of Buyer shall survive the closing for a period of twelve (12) months.

## Article IV.
## ACTIONS BY SELLER AND CORPORATION PENDING CLOSING

From and after the date hereof and until the Closing Date, Seller warrants and agrees as follows:

**4.01. Full Access.** Buyer and their authorized representatives shall have reasonable access during normal business hours to all properties, books, records, contracts and documents of the Corporation, and Seller shall furnish

or cause to be furnished to Buyer or their authorized representatives all information with respect to the affairs and business of the Corporation as Buyer may reasonably request.

**4.02. Regular Business.** The Corporation shall carry on its business diligently and substantially in the manner as heretofore conducted and the Corporation shall not make or institute any unusual methods of purchase, sale, management, accounting, or operation, except with the prior written consent of Buyer. The Corporation shall not enter into any contract or commitment to purchase or sell any of its Assets (other than inventory) or engage in any transaction not in the usual and ordinary course of business without the prior written consent of Buyer.

**4.03. Increase in Salaries.** Without the prior written consent of Buyer, the Corporation shall not increase or decrease the rates of pay of its employees or increase or decrease the fixed compensation payable or to become payable to any officer, employee, or agent of the Corporation.

**4.04. Preservation of Organization.** Seller shall use its best efforts to preserve the Corporation's business organization intact, to keep available to Buyer the present employees of the Corporation and to preserve for Buyer the present relationships of the Corporation with its suppliers, distributors, and customers. The Corporation shall not amend its Articles of Incorporation or Bylaws or make any changes in its Ownership Interests.

**4.05. Default.** The Corporation shall not act or omit to do any act, or permit any act or omission to act, which will cause a breach of any contract, commitment, or obligation.

**4.06. Dividends.** The Corporation shall not declare or pay any dividend or make any distribution, directly or indirectly, in respect of its Ownership Interests or other securities, nor shall the Corporation directly or indirectly redeem, purchase, sell or otherwise acquire or dispose of its Ownership Interests.

## Article V.
## CONDITIONS PRECEDENT TO BUYER'S OBLIGATIONS

Each and every obligation of Buyer to be performed on the Closing Date shall be subject to the satisfaction prior to or on the Closing Date of the following conditions, unless waived in writing by Buyer:

**5.01. Representations and Warranties of Seller.** The representations and warranties made by Seller in this Agreement shall be true and correct on and as of the Closing Date with the same effect as though such representations and warranties had been made or given on and as of the Closing Date.

**5.02. Compliance With Agreement.** Seller shall have performed and complied with all of their obligations under this Agreement which are to be performed or complied with by them prior to or on the Closing Date.

**5.03. No Material Change.** The Assets shall not be adversely affected or threatened to be affected in any way as a result of any fire, explosion, earthquake, disaster, accident, act of God or any action or threatened action by any governmental authority.

## Article VI.
## CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS

Each and every obligation of Seller to be performed on the Closing Date shall be subject to the satisfaction prior to or on the Closing Date of the following conditions, unless waived in writing by Seller:

**6.01. Representations and Warranties of Buyer.** The representations and warranties made by Buyer in this Agreement shall be true and correct on and as of the Closing Date with the same effect as though such representations and warranties had been made or given on and as of the Closing Date.



DS JAB | DS DAB | DS CD

**6.02. Compliance With Agreement.** Buyer shall have performed and complied with all of its obligations under this Agreement which are to be performed or complied with by it prior to or on the Closing Date.

## Article VII.
## COVENANTS OF SELLER

**7.01. Pre-Closing Covenants of Seller.**

a. Prior to Closing, Seller shall use all commercially reasonable efforts to fulfill and perform all conditions and obligations to be fulfilled and performed by it under this Agreement at the earliest practicable time, and to cause the transaction contemplated by this Agreement to be consummated in accordance herewith.

b. Prior to the sale, assignment, transfer, conveyance and delivery transfer of the Shares, Seller shall deliver to Buyer a true and correct copy of each of the Existing Liabilities and/or Agreements.

c. Prior to the sale, assignment, transfer, conveyance and delivery transfer of the Shares, Seller shall cause the Corporation to satisfy, discharge, cancel or terminate all of the Existing Liabilities and/or Agreements, except for those set forth in **Schedule 10,** attached hereto (the "Continuing Liabilities").

d. Prior to the sale, assignment, transfer, conveyance and delivery transfer of the Shares, Seller shall deliver to Buyer the balance sheet, income or profit and loss statements, and cash flow statements for the Corporation, as well as the tax returns for the year 2022, if available prior to Closing (the "Financial Statements").

e. Prior to the sale, assignment, transfer, conveyance and delivery transfer of the Shares, Seller shall not cause or permit the Corporation to enter into any agreement or amend, modify, or terminate any of the Existing Liabilities and/or Agreements, without the written consent of the Buyer.

f. Prior to the sale, assignment, transfer, conveyance and delivery transfer of the Shares, Seller shall not cause or permit the Corporation to adopt or amend the Certificate of Articles of Incorporation, By-laws, Shareholder Agreements, if any, for the Corporation.

g. Prior to the sale, assignment, transfer, conveyance and delivery transfer of the Shares, Seller shall not cause or permit the transfer of any Assets other than in the ordinary course of business.

h. Prior to the sale, assignment, transfer, conveyance and delivery transfer of the Shares, Seller shall not cause or permit any transfers of the Shares.

i. Prior to the sale, assignment, transfer, conveyance and delivery transfer of the Shares, Seller shall not cause or permit the Corporation to adjust the compensation of any officer, director, employee, agent or consultant of the Corporation without the written consent of the Buyer.

j. Prior to the sale, assignment, transfer, conveyance and delivery transfer of the Shares, Seller shall refrain from, directly or indirectly, asserting, commencing or instituting, or causing to be asserted, commenced or instituted, any claim before any federal, state, local or foreign court or governmental or regulatory agency or authority, or any multinational or organizational body (a "Governmental Authority"), or taking any other action whatsoever, to attempt to invalidate, void or otherwise challenge the validity or enforceability of all or any part of this Agreement, subject to the termination provisions of Article VIII hereunder.



DS JAB DS DAB DS CD

k. Prior to the sale, assignment, transfer, conveyance and delivery transfer of the Shares, Seller shall cause the Corporation to be managed and operated in the ordinary course of business and consistent with past practices, and shall not cause, permit, or consent to any action that is inconsistent therewith.

l. Prior to the sale, assignment, transfer, conveyance and delivery transfer of the Shares, Seller shall cause the Corporation to maintain all insurance coverage in place as of the Effective Date.

m. Prior to the sale, assignment, transfer, conveyance and delivery transfer of the Shares, Seller shall not cause or permit the Corporation to incur any additional obligations or liabilities other than in the ordinary course of business (beyond its obligations and liabilities under the Existing Liabilities and/or Agreements).

n. Seller at or prior to closing shall be permitted and authorized to distribute to its shareholders all cash on hand and in the Corporation's bank accounts. Further, Seller shall be entitled to be reimbursed by Buyer for all items that Seller has prepaid (i.e. insurance, licenses etc.,) and for all security deposits that Corporation has with utilities and/or vendors, so long as said funds inure to the benefit of Buyer.

o. Sellers shall cause the Corporation to satisfy, discharge, cancel or terminate all of the Existing Liabilities and/or Agreements, except for those set forth in **Schedule 11**, attached hereto and made a part hereof (the "**Continuing Liabilities**").

**7.02. Pre-Closing Covenants of Buyer.** Prior to the Closing, Buyer shall use all commercially reasonable efforts to fulfill and perform all conditions and obligations to be fulfilled and performed by it under this Agreement at the earliest practicable time, and to cause the transaction contemplated by this Agreement to be consummated in accordance herewith.

**7.03. Post-Closing Covenants of Seller**. Seller shall indemnify Buyer and the Corporation for all accounts payable of the Corporation arising from the period prior to the Closing, except for those accounts payable assumed by the Buyer in writing. Seller covenants to provide those obligations identified in Section 2.01(c)(i-ii), above.

**7.04. Post-Closing Covenants of Buyer**. Buyer shall indemnify Seller for all accounts payable of the Corporation arising from the period subsequent to the Closing, and Buyer shall indemnify and hold harmless Seller from any claims arising from Buyer's ownership and operation of the Corporation during the period subsequent to the Closing. On the Closing Date Buyer shall be responsible for all Corporation payroll and and other costs of ownership.

**7.05. Post-Closing Joint Covenants**. Seller and Buyer shall each use commercially reasonable efforts to cooperate with one another in taking any actions necessary or advisable to effect the consummation of the transaction contemplated by this Agreement.

**7.06. Further Assurances.** Seller agrees to use its best efforts to obtain any consents by any third party or government authority or agency required or deemed desirable by Buyer in connection with the consummation of the transactions contemplated by this Agreement.

**7.07. Confidential Information**. Seller agrees not to communicate, divulge or use for the benefit of any person, firm, association or corporation any of the trade secrets, business methods, files, customer lists, promotional materials, instruction manuals, reports or any other confidential or proprietary information of the Corporation for a period of thirty-six (36) months after Closing.



DS JAB DS DAB DS CD

## Article VIII.
## TERMINATION

This Agreement may be terminated and abandoned on or prior to the Closing Date as follows: (i) by mutual consent of all parties hereto, (ii) by Seller if the conditions precedent contained in Article VI hereof have not been fulfilled or waived in writing on or prior to the Closing Date, (iii) by Buyer if the conditions precedent contained in Article V hereof have not been fulfilled or waived in writing on or prior to the Closing Date, or (iv) by Buyer or Seller if the Closing has not occurred by the Closing Date.

## Article IX.
## MISCELLANEOUS

**9.01. Amendment.** Buyer and Seller may amend, modify, and supplement this Agreement in such manner as may be mutually agreed by them in writing.

**9.02. Fees and Expenses.** Except as otherwise provided herein, the parties hereto shall bear their own costs and expenses incurred in connection herewith and with the transactions contemplated hereby, whether the Closing occurs or this Agreement shall be terminated.

**9.03. Assignment.** No party shall assign this Agreement or any of its rights and obligations hereunder without the prior written consent of the other parties.

**9.04. Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the parties hereto, their heirs, legal representatives, successors and permitted assigns.

**9.05. Notices.** Any notice, demand or request required or permitted to be given under any provision of this Agreement shall be in writing and delivered personally or by registered or certified mail (return receipt requested, with postage prepaid) to the following address, or to such other address as any party may request by notice in writing to the other parties:

(a) If to Buyer:

TRELON, LLC
2744 Dogtown Road
Goochland, VA 23063

With a copy to:

The Saade Law Firm, P.A.
Attn. Gabriel S. Saade, Esq.
255 Alhambra Circle, Suite 320
Coral Gables, FL 33134
gss@saadelaw.com

(b) If to Seller

Dee Ann and Jeffrey Brubaker
1420 Westshire Lane
Henrico, VA 23238
djknbrubaker@comcast.net

With a copy to:

Scott Simmons Law PC
Attn. Scott A. Simmons
116 B Walton Parke Lane
Midlothian, VA 23114
simmons@scottsimmonslaw.com



DS JAB DS DAB DS CD

**9.06. Entire Agreement.** This Agreement constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof, superseding any and all prior agreements, understandings, negotiations and discussions.

**9.07. Construction.** The captions and headings of this Agreement are for convenience and reference only and shall not control or affect the meaning or construction of this Agreement. Use of the masculine gender shall also be deemed to refer to the feminine gender and neuter gender and the singular to the plural unless the context clearly requires otherwise.

**9.08. Choice of Law.** This Agreement shall be construed, governed, and enforced in accordance with the laws of the State of Virginia.

**9.09. Severability.** The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision was omitted. The invalidity or unenforceability of any provision of this Agreement to any person or circumstance shall not affect the validity or enforceability of such provision as it may apply to any other persons or circumstances.

**9.10. Waiver.** The failure in one or more instances of a party to insist upon performance of any of the terms, conditions and covenants set forth in this Agreement, or the failure of a party to exercise any right or privilege conferred by this Agreement, shall not be construed thereafter as waiving their right to insist upon the performance of such terms, conditions and covenants or the right to exercise such rights and privileges, which rights shall continue and remain in full force and effect as if no forbearance had occurred.

**9.11. Attorney Fees.** In the event of any litigation between the Parties arising out of or relating to this agreement, the prevailing party shall be entitled to recover all costs incurred and reasonable attorneys' fees, including attorneys' fees in all investigations, trials, bankruptcies and appeals.

**9.12. Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original instrument, but all of which together will constitute for all purposes one and the same instrument.

**9.13. Mandatory Mediation.** To ensure the timely and economical resolution of disputes that arise in connection with this Agreement, the Parties agree that any and all disputes, claims, or causes of action arising from or relating to the enforcement, breach, performance or interpretation of this Agreement, or the termination of this Agreement, shall be resolved to the fullest extent permitted by law by mutually agreed-upon mediator in Hanover County in Virginia. In the event mediation fails to resolve the dispute, Parties agree that any and all disputes, claims, or causes of action arising from or relating to the enforcement, breach, performance or interpretation of this Agreement, or the termination of this Agreement, or any of the transactions contemplated hereby (a "Proceeding") shall be brought exclusively in a state or federal court of competent jurisdiction located in Hanover County, Virginia, and each of the parties irrevocably submits to the jurisdiction of each such court in any such Proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of a Proceeding shall be heard and determined only in any such court and agrees not to bring any a Proceeding in any other court. Process in any Proceeding may be served on any party in any manner permitted under Section 9.1 above. THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY PROCEEDING, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. The mediators or trial court shall award attorneys' fees and costs to the substantially prevailing party in accordance with Section 9.11 of this Agreement. The fees of the mediator shall be borne equally by the Parties except that, in the discretion of the mediator, any award may include a Party's share of such fees. Any and all claim or disputes submitted pursuant to this Section 9.13 shall be brought and governed by the laws and courts of Virginia.



DS JAB DS DAB DS CD

**9.14. Expenses.** Each Party shall pay all of its own costs and expenses (including attorneys', accountants' fees and other out-of-pocket expenses) in connection with the negotiation and execution of this Agreement.

**9.15. Headings; Exhibits**. The section headings contained in this Agreement are for convenience only and shall not be considered in the interpretation or construction of the provisions of this Agreement. The term "this Agreement" shall be deemed to include each of the exhibits and schedules hereto, any documents based on such exhibits and schedules and any other statement, certificate, instrument or other document furnished or delivered by the Parties in connection with this Agreement or the transaction contemplated hereby.

*Remainder left blank*
*Signatures follow*



DS JAB DS DAB DS CD

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**The Seller**:

1A430D67E0CE458
Jeffrey A. Brubaker
DocuSigned By: Jeffrey A. Brubaker

Jeffrey Brubaker
Shareholder of JUMP IN, INC.

**The Seller**:

DocuSigned by:
Dee Ann Brubaker

Dee Ann Brubaker
Shareholder of JUMP IN, INC.

**The Buyer:**

**TRELON, LLC**, a
Virginia limited liability Company

DocuSigned by:
Cornelius Dandridge

By: Cornelius Dandridge
Title: CEO

# Exhibit B

DocuSign Envelope ID: 8D88B378-63C0-4F9C-A855-1CA486A5BE75

**Trelon, LLC (Buyer)**
**Stock Purchase of Certain Assets of**
**Jeff Brubaker and Dee Ann Brubaker (Seller)**

**Estimated Settlement and Disbursement Statement**

| | | | |
|---|---|---|---|
| Closing Date: | 4/11/24 | | |
| Days in Year (2024 = 366; 2021 = 365): | 366 | Buyer Days In Closing Month: | 19 |
| First Day of Year: | 1/1/24 | Last day of Closing Month: | 4/30/24 |
| Buyer Days This Year: | 264 | Seller Days This Year (Incl Day of Closing): | 102 |

| Summary of Buyer's Transaction | |
|---|---|
| **Gross Amount Due from Buyer** | |
| Base Business Sales Price | $750,000.00 |
| Buyer's Closing Costs (See detail) | $0.00 |
| Debit for Work-in-Process due Seller | $0.00 |
| | |
| *Adjustments for Items Paid by Seller in Advance* | |
| Rent: 19 days at $106.67 per day (3,200.00/30) | $2,026.67 |
| Prorated Items Paid in Advance | $22,406.59 |
| | |
| Gross Amount Due From Buyer | $774,433.26 |
| **Amounts Paid By or on Behalf of Buyer** | |
| Deposit or Earnest Money* | $0.00 |
| Principal Amount of New Loan | $0.00 |
| Closing Costs Paid by Buyer | $0.00 |
| Seller Financing | $300,000.00 |
| Deferred Down Payment | $300,000.00 |
| Credit for Customer Credits (Gift Cards, Deposits, etc.) | $8,664.20 |
| Credit for Work-in-Process due Buyer | $58,238.06 |
| *Adjustments for Items Unpaid by Seller* | |
| Prorated Items Paid in Arrears (to be paid by Buyer) | $68.00 |
| | |
| Total Paid By/For Buyer | $666,970.26 |
| **Cash at Settlement From/To Buyer** | |
| Gross Amount Due From Buyer | $774,433.26 |
| Less Amount Paid By/For Buyer | ($666,970.26) |
| Cash From (To) Buyer | $107,463.00 |

*Earnest Money Deposit to be applied at closing.

| Summary of Seller's Transaction | |
|---|---|
| **Gross Amount Due to Seller** | |
| Base Business Sales Price | $750,000.00 |
| Other 2 | $0.00 |
| Credit for Work-in-Process due Seller | $0.00 |
| | |
| *Adjustments for Items Paid by Seller in Advance* | |
| Rent: 19 days at $106.67 per day (3,200.00/30) | $2,026.67 |
| Prorated Items Paid in Advance | $22,406.59 |
| | |
| Gross Amount Due To Seller | $774,433.26 |
| **Reductions in Amount Due To Seller** | |
| Seller's Closing Costs | $0.00 |
| Commission to Murphy | $73,300.00 |
| Other 9 | $0.00 |
| Seller Financing | $300,000.00 |
| Deferred Down Payment | $300,000.00 |
| Debit for Customer Credits (Gift Cards, Deposits, etc.) | $8,664.20 |
| Debit for Work-in-Process due Buyer | $58,238.06 |
| *Adjustments for Items Unpaid by Seller* | |
| Prorated Items Paid in Arrears (to be paid by Buyer) | $68.00 |
| | |
| Total Reduction Amount Due Seller | $740,270.26 |
| **Cash at Settlement From/To Seller** | |
| Gross Amount Due To Seller | $774,433.26 |
| Less Reductions Due Seller | ($740,270.26) |
| Cash To (From) Seller | $34,163.00 |

***No payoff entered. ok

All proration calculations are first rounded to 4 decimal places, then to 2.

Seller pays for day of closing on prorations.

| Reviewed and Approved: | Date |
|---|---|
| Buyer DocuSigned by: *Cornelius Dandridge* | 4/11/2024 |
| Seller 1A430D67E0CE458 *Jeffrey A. Brubaker* DocuSigned By: Jeffrey A. Brubaker | 4/11/2024 |

<u>Closing Costs to Buyer</u>

| | |
|---|---|
| Legal | $0.00 |
| Title Insurance Premium | $0.00 |
| Recording Fees Loan - _____ County | $0.00 |
| Other | $0.00 |
| Other | $0.00 |
| Other | $0.00 |
| Total Closing Costs to Buyer | $0.00 |

# Exhibit C

377

WELLS FARGO BANK N.A.
P.O. BOX 6995
PORTLAND, OR 97228-6995

WELLS FARGO

004475 W9TRI249
JEFFREY BRUBAKER
DEE ANN BRUBAKER
1420 WESTSHIRE LN
RICHMOND VA 23238-3908

W9TRI249 004475 1492942R323 00001 CW9RI2TA 01R231

ITEMS ENCLOSED: 1

PAGE 1 OF 1 ACCOUNT CHARGED XXXXXX0678 DATE: 05-28-2024

| | REASON FOR NON-PAYMENT | SEQUENCE # | AMOUNT |
|---|---|---|---|
| DEPOSITORY ACCOUNT NUMBER: | XXXXXX0678 | | |
| YOUR ACCOUNT HAS BEEN CHARGED FOR THE FOLLOWING PAPER ITEM(S) RETURNED UNPAID. | | | |
| | NSF-Insuf Funds | 3332622551 | 50,000.00 |
| TOTAL CHARGES FOR PAPER RETURNS | | | 50,000.00 |

TOTAL CHARGES FOR PAPER RETURNS 50,000.00

SHOULD YOU HAVE ANY QUESTIONS OR REQUIRE ADDITIONAL INFORMATION, PLEASE CALL THE PHONE NUMBER THAT IS LISTED ON YOUR BANK STATEMENT.

NSF

05/28/2024
3332622551

This is a LEGAL COPY of your check. You can use it the same way you would use the original check.

RETURN REASON - A
NOT SUFFICIENT FUNDS

00504233320033 05/28/2024
[1221052783]

JUMP IN INC
P O BOX 122
SANDY HOOK, VA 23153

1007

DATE 5/23/2024

PAY TO THE ORDER OF Jeff Brubaker $ 50,000

Fifty thousand and 00/100 DOLLARS

Wells Fargo Bank, N.A.

FOR DDP Deposit C. Dandridge, A

⑈0000001007⑈ ⑆051400549⑆ 6128756324⑈

⑈0000001007⑈ ⑆051400549⑆ 6128756324⑈ ⑈0005000000⑈

W9TRI249 004475 149224228323 000002 CW9RI2TA 018233

Security Features exceed industry standards and include:
- MobileMark [illegible] Mobile Deposit check mark to indicate check has been deposited via mobile device
- The Security [illegible] pattern [illegible] changed [illegible]
- Microprint [illegible] printed [illegible] front and back
- The words "ORIGINAL DOCUMENT" [illegible] the back
- [illegible] visible on front and back

Do not cash if:
- [illegible]
- [illegible]
- [illegible]

5082332033

05/24/2024

ENDORSE HERE

CHECK BOX FOR MOBILE DEPOSIT

Do not endorse or write below this lin

# Exhibit D

SIMMONS LAW

June 3, 2024

**Via Personal Delivery**

Trelon, LLC
c/o Cornelius Dandridge, CEO
2744 Dogtown Road
Goochland, VA 23063

**Re:** ***Acquisition of Stock of Jump In, Inc. by Trelon, LLC:* Notice by Sellers Declaring Transaction Void pursuant to Section 1.03(b) of Stock Purchase Agreement dated as of April 11, 2024**

Dear Trelon, LLC and Mr. Dandridge:

On behalf of my clients Jeffrey and Dee Ann Brubaker (collectively "Seller"), this letter shall serve as formal Notice under Section 1.03(b) of the above-referenced Stock Purchase Agreement (the "SPA") that Sellers under the SPA are exercising their option under Section 1.03(b)(i) to declare the transaction void, default having been made by Trelon, LLC ("Trelon") in paying the Deferred Down Payment (the "DDP") of $300,000.00 due by May 11, 2024. As you know from the SPA, the result of this declaration is that "if the transaction is declared void by Seller, Seller may retain the $150,000 cash paid at closing and Buyer agrees to return all stock and assets of [Jump In, Inc.] to Seller, and the parties shall have no further obligations to one another, except to respect and return each party's confidential information and documents." *See* Section 1.03(b)(ii).

To ensure that this Section of the SPA and this notice under the same is given full effect, and to avoid unnecessary future litigation and attendant expense, please be advised that until the Jump In, Inc. stock and assets are fully delivered by you, Trelon is expected to operate Jump In, Inc. (the "Corporation") properly in the ordinary course of business, not to incur any liabilities (except in the ordinary course of business) and to return all amounts in all bank accounts of the Corporation, including but not limited to all customer deposits and credits for any unfulfilled obligations. Of course, the stock and all other assets of the Corporation, including without limitation all books and records of the Corporation, must be returned as well. Because you and the Corporation were unable to pay the debt of the DDP when due, if any distributions or excessive pay was provided to Trelon or to you, those amounts must be returned as well. We trust that was not the case.

Please be advised that Jeff will immediately take over the use and operations of the warehouse and scheduling, and Dee Ann will immediately take over the operations of the office. We trust that you will cooperate fully with them.

Provided that you and Trelon cooperate fully in this process, my clients will make this process as fast and easy for you as possible, and we do not anticipate the necessity of litigation, as the applicable provisions in the SPA were specifically written to address this failure to pay the DPP, and to thereby essentially reverse the transaction at the option of the Sellers.

Please let me know if you are represented by counsel in this matter, and who that counsel may be. Thank you for your anticipated cooperation.

Sincerely,

Scott A. Simmons

Scott A. Simmons

Cc: Jeffrey and Dee Ann Brubaker (by email)
The Saade Law Firm, P.A., attn: Gabriel S. Saade, Esq. (by email and by certified mail, return receipt requested)